[No. 7850.]

## DIXON v. THE PEOPLE.

1. CONSTITUTIONAL LAW—*Construction of the Constitution*—The constitution is to be construed as a whole, including the amendments, giving to each word its proper effect, and so far as possible harmonizing each provision with every other. The same meaning is to be

ascribed to the same words in the different articles and sections, un-
less it clearly appears from the context that a different sense was in-
tended in what is alleged to be an exception.

2.  ——Article XX—There exist within the limits of the munici-
pality known as the City and County of Denver, a county, and a state
and county government, as in other parts of the state.  The effect of
article XX is to impose upon the inhabitants of that territory the
power and duty to designate the agencies which shall exercise the
powers, and discharge the duties, which are elsewhere committed to
county officers.

The phrase "county officers" in section 2, of article XX, means
those who are designated as county officers by article XIV, and none
other.

3.  ——County Judge Not a County Officer—All the officials des-
ignated as county officers are enumerated in section 6, of article XIV.
The judge of the county court is not of the number and considering
the provisions of article VI it is manifest that the judge of the county
court is no more an officer of the county in which he exercises judicial
functions than is the judge of the district court an officer of the dis-
trict, in the courts where he presides.  Each is an officer of the state.
The prefix, "district," "county," or "criminal," as used in article VI,
has in each case no signification whatever, save to confer an appro-
priate name to these respective tribunals of government, and in no
sense implies that the persons who are chosen to preside in such
tribunals become officers of the respective agencies which bear these
territorial designations.

*Error to Denver District Court.*—Hon. GREELEY W.
WHITFORD, Judge.

Mr. JOHN R. DIXON, *Pro se.*

Mr. E. P. COSTIGAN, Mr. HUGH McLEAN, Mr. CHESTER
E. SMEDLEY and Mr. JOSEPH D. PENDER, for defendant in
error.

Mr. JUSTICE WHITE delivered the opinion of the court:

This controversy is over the right of different claimants
to hold and enjoy the office of county judge of the county
court within the political and corporate entity known as the
city and county of Denver.  The plaintiff in error, John R.
Dixon, is the incumbent of the office, and claims the right to

hold the same by virtue of his election thereto at the general election for state and county officers held on November 3, 1908, for the term of four years commencing on the second Tuesday of January, 1909.

May 21, 1912, Wayne C. Williams and Roger H. Wolcott were elected county judges, by virtue of the provisions of the charter of the city and county of Denver. Art. IV, sec. 131, *et seq.* There being no incumbents of the office under the charter, Williams and Wolcott immediately qualified and demanded the ouster of Dixon, and the cessation by him of the exercise of the functions which they claim pertain to the office to which they were elected. *Quo warranto* proceedings were thereupon instituted against Dixon, resulting in his ouster from the office and the induction therein of Williams and Wolcott.

We have repeatedly held that a county, and likewise state and county governmental functions and duties, exist in the territory known as the city and county of Denver, as they exist in other portions of the state, and the sole effect of article XX of the constitution, in relation thereto, is to impose upon the inhabitants of such territory the power and duty to designate the agencies which shall therein discharge the acts and duties required of county officers to be done by the constitution and general law. And furthermore, that the city and county of Denver has not been freed from the constitution, but is as much subject thereto as any other part of the state, though portions of the constitution, as it existed prior to the adoption of article XX, became inapplicable to such territory because of the express provision of the new article.—*People v. Cassidy,* 50 Colo. 503; *Mauff v. People,* 52 Colo. 562, 123 Pac. 101.

Adhering to these decisions, it follows that if a judge of a county court is a county officer within the meaning of the constitution, the judgment of ouster, as far as it affects plaintiff in error, is right; otherwise, it is wrong. This is true irrespective of the question of the validity of the provisions of

the charter enlarging the duties of county judge, and providing for two incumbents of the office instead of one. So the sole question we deem necessary to determine herein is, whether a county judge is a county officer within the meaning of the constitution? To reach a proper solution of the problem it is essential that we take the constitution as it is, including every part thereof relating to the subject-matter under consideration, and construe the instrument as a whole, causing it, including the amendments thereto, to harmonize, giving to every word as far as possible its appropriate meaning and effect.—*People ex rel. v. Le Fevre,* 21 Colo. 218.

Except as in the constitution otherwise provided, article VI thereof vests the judicial power of the state, as to matters of law and equity, in a supreme court, district courts, county courts, justices of the peace and such other courts as may be provided by law.

Courts, in the constitutional sense, are the tribunals established for the purpose of administering justice. 11 Cyc. 633, 655. Without them the judicial power lies dormant and inactive in the people. In creating them it is essential, among other things, that the sovereign fix or make provision for fixing limits within which the power is to be exercised. Accordingly, in the formation of constitutions, it is customary to sub-divide the territory constituting the state, and create or establish courts within and for such sub-divisions. So our constitution, having vested judicial power in certain courts, as designated in article VI, *supra,* fixes the territorial limits in which such courts shall transact business, or makes provision therefor.

As to district courts the duty is imposed upon the general assembly to divide the state into judicial districts, in each of which judges, as provided by law, are to be elected by the electors thereof for a term of six years. As to county courts, it, in effect, adopts a sub-division established by sec. 1 of art. XIV of the constitution in the creation of counties, which is evidenced by sec. 22 of art. VII, providing for the election in

each· organized county, for a term of four years, of ·"a county judge; who shall be judge of the county.court of· said county." And in sec. 24 of art. VI like adoption is made of the county as the territorial· entity in making provision for the establishment of criminal courts in counties having a population in excess of a designated number. ·As to justices of the peace the matter is left with the general assembly, as is that relative to the establishment of other courts.

When we consider that counties are involuntary political and civil divisions of the territory constituting the state, created to aid in the administration of governmental affairs; that they are really *quasi* corporations or subordinate agencies for orderly government within the scope of their authority and have certain well-known duties to perform through .officials provided for that purpose, while territorial divisions or districts created in which to establish courts have no semblance of corporate character, no duties or· functions to perform, it is clear that the selection by the organic law of a local sub-division of the state known as a "county," for and within which to establish a court, does not make the functions of the court, county functions, or the officers of the court, county officers. A court of record is essentially not an office; it is an institution, an entity, or agency within itself, invested with certain functions, just as the county is another agency within itself, invested with other duties to perform. ·

Clearly the use of the words "district," "county" and "criminal" in article VI as prefixes to the word "courts" has no other significance than to give appropriate names to tribunals of government. The prefixes can in no sense imply that the persons, who, under the law, become the members or officers of such tribunals, thereby become officers of the respective entities that bear such prefixes as their territorial designation. This is essentially true, because the subject dealt with, and the thing created is "courts." Moreover, in making provision for the establishment and maintenance of courts, it is "judges of courts," not officers of districts, or counties, or

political or territorial entities, that the constitution commands shall be elected. So we conclude there is nothing in article VII that signifies that the officers therein named, or for which provision is therein made, are county officers. The article covers the subject of the judicial power of the state, creates its courts, or makes provision therefor, and does not purport to treat of either county or county officers. We must, therefore, direct our attention to other portions of the organic law to ascertain if there be a constitutional declaration as to what officers are county officers within the meaning of that instrument. It is not necessarily the duties to be performed, the territory which elects, the manner of election, appointment or removal of the incumbent from office, that classifies an office, though in the absence of definite constitutional or legislative classification such matters would be persuasive, and, perhaps, controlling. Be that as it may, whatsoever the constitution hath said, if anything, relative to classification, must control the courts.

We have examined the original manuscript of the constitution on file in the office of the secretary of state. In article VI thereof the several headings or subjects treated are set forth. As a heading to section 1 appears the words, "Judicial Department;" to section 2, "Supreme Court;" to section 11, "District Courts;" to section 21, "District Attorney;" to section 22, "County Court;" to section 24, "Criminal Court;" to section 25, "Justices of the Peace;" to section 26, "Police Magistrates," and to section 27, "Miscellaneous." In article XIV we find the following subjects: as a heading to section 1 the word "Counties;" to section 6 the words, "County Officers," under which heading we find, not only in the original manuscript but also in the instrument as amended, the creation and provision for the establishment of certain offices and the election of officers thereto. Section 6 of the article provides for the election of county commissioners; section 8 for the election of one county clerk; one sheriff; one coroner; one treasurer; one county superintendent of schools; one county

surveyor; one county assessor, and for the election or appointment of one county attorney; section 11 pprovides for the eelction of justices of the peace and constables in each precinct in each county, and section 12 directs the general assembly to provide for the election or appointment of such *other county,* township, precinct and municipal officers as public convenience may require.

In proposing and adopting article XX the people necessarily had in mind and knew that the incumbents of certain offices created by article XIV, or therein mentioned, were therein designated "county officers," and no other officers were so designated in the constitution.. It is, therefore, incontrovertible that by the use in sec. 2 of art. XX of the words "county officers" in requiring that every charter shall designate the officers who shall "perform the acts and duties required of county officers to be done by the constitution or by the general law, as far as applicable," they meant "county officers" that are such by reason of the provisions of article XIV and none other. This is true under the well established rule that the same meaning will be given to the same words occurring in different parts of the same constitution, unless it clearly appears therefrom that a different meaning was intended in some part alleged to be an exception.

That the use of the words "county officers" as found in article XX is identical with the use of the same words in article XIV is made evident from other language of the former article. That article created a new political and corporate entity, likewise declared that it should always constitute one judicial district of the state, and terminated the terms of office of all officers of the old and included municipalities and of the county of Arapahoe. It provided for a temporary government of such newly created entity, and in doing so likewise made provision, during the existence of the temporary government, for the performance within such territory of the duties required of county officers to be done by the constitution and general law, as far as applicable. In doing so it

named every officer—save county superintendent of schools—
that is expressly created by article XIV or therein denom-
inated "county officers," and made provision for the perform-
ance within the new entity of the duties pertaining to such
offices. And then declared, in substance, that upon the adop-
tion of the charter the terms of such officials should cease
and the temporary government terminate. Not so as to dis-
trict judges, county judge and district attorney. While it
named them, the article expressly declared that they "shall
serve their full term, respectively, for which elected." Is not
this significant and pregnant with meaning? · Why should
the terms of office of the officials who are named and whose
election is provided for in each county under article XIV,
terminate upon the adoption of the charter, and that of dis-
trict judges, county judge and district attorney continue for
the full terms for which they, respectively, were elected? The
reason is readily apparent. The former are clearly county
officers within the meaning of the constitution, while the
latter are not, and the power to designate the agencies to dis-
charge state and governmental functions within the territory
is limited to county officers, and to them alone. Article XX,
having officered the newly created entity with temporary offi-
cials who were to perform municipal and county functions
therein, limited their terms of office until such time as a char-
ter was adopted, thus leaving such people free to obey the con-
stitutional mandate to designate in their charter the officers
who shall respectively perform the acts and duties required
of county officers to be done by the constitution or general
law, as far as applicable. And as other provisions of the con-
stitution require that in every county there shall be a county
court, and a judge thereof, and in every judicial district a
judge or judges of the district court, and a district attorney,
and the newly created entity was not only a city and county,
but likewise a judicial district, such judicial officers then serv-
ing therein were empowered and directed "to serve their full

terms, respectively, for which elected," which was until the next general election.

The fact of the omission, as hereinbefore noted, of county superintendent of schools in providing for the provisional government of the city and county of Denver, is of no importance. The omission was probably a clerical mistake, or more likely explained upon the assumption that sec. 7 of art. XX, wherein the city and county of Denver is constituted one school district, and the board of education thereof invested with the power to "perform all the acts and duties required to be performed within said district by the general laws of the state" completely eliminated the necessity for a temporary county superintendent of schools, and it was assumed that when the charter was adopted such board of education would therein be named to perform the acts and duties pertaining to such office.

The proposal and adoption of secs. 6, 8 and 11 of art. XIV, art. XX and secs. 21 and 22 of art. VI, as they now stand, evidence a legislative intent to exclude from the operation of art. XX, as a county officer, that of county judge. These several provisions were adopted on the same day at the general election in November, 1902. As heretofore stated, art. XIV covers and deals with county officers, requiring their election every two years in each county, extending the terms of office of those then serving; some to January, 1905, and the others to January, 1907. Article VI creates the judicial department. The sections, as amended, cover the subject of county judge and district attorney, respectively, requiring them to be elected every four years, a county judge in each county of the state, and a district attorney in each judicial district, and extend the terms of such officers then serving to the second Tuesday in January, 1905. Article XX creates the city and county of Denver. In each of the above designated sections of article XIV, as amended, are these words: "This section shall govern except as hereafter otherwise expressly directed or permitted by constitutional en-

actment," while in secs. 21 and 22 of art. VI, as amended, no words of limitation occur. These several amendments, including art. XX, as heretofore stated, were adopted on the same day, written into, became, and now are a part of the constitution. So as it now is, the sections of the constitution providing for the election of county officers in each county provide, in effect, that they shall not apply to the city and county of Denver in event that art. XX shall be adopted, as the power is therein granted to the people of the city and county of Denver to designate the agencies to perform such functions within that territory. The sections providing for the election in each county of a county judge, and in each judicial district a district attorney, contain no such provision. Therefore, the constitutional requirement that such officers be elected every four years within their respective territory must be obeyed, unless the requirement is made inapplicable in certain territory by constitutional provision. It is claimed this is done by sec. 8 of art. XX, which reads: "Anything in the constitution of this state in conflict or inconsistent with the provisions of this amendment is hereby declared to be inapplicable to the matters and things by this amendment covered and provided for." We cannot ascribe such meaning to the language. It is only the things in the constitution that are in conflict or inconsistent with the provisions of article XX that are declared to be inapplicable to the matters covered therein. In that article county courts are not mentioned, and the only reference to county judges is to declare that the one then serving within the new entity shall serve the full term for which he was elected. Clearly this language and this requirement in no wise conflict with section 22 of article VI. The two expressly harmonize. Whereas, if a county judge is a county officer within the meaning of the constitution, the provisions of article XX are inconsistent with themselves. The article requires the charter to designate the agencies to perform the functions and duties of county officers, and declares that the charter shall become effective upon adoption,

notwithstanding it is further declared in the article that the county judge then serving shall continue to perform the functions of that office, not until a charter is adopted, but for the full term for which he was elected.

Moreover, such legislative intent is apparent from the manner of proposal and submission of the hereinbefore mentioned constitutional amendments of articles VI and XIV. These amendments were the subject of two separate bills, both introduced by senator Taylor. One is designated: "An act to submit to the qualified electors of the state of Colorado an amendment to sections twenty-one and twenty-two of article six of the constitution of the state of Colorado;" the other is designated: "An act to submit to the qualified electors of the state of Colorado an amendment to sections six, eight and eleven of article fourteen of the constitution of the state of Colorado." Forms of ballot were prescribed wherein the amendment to the sections of article XIV was designated an amendment "concerning county officers;" whereas there is no reference to county officers in the form of ballot prescribed as to the amendment of the sections of article VI. And further, the proposal for the amendment concerning county judges and district attorneys was one measure. Thus the lawmaking power associated in one piece of legislation, district attorneys and county judges. It likewise so associated them with district judges in article XX in declaring that such officials then serving within the city and county of Denver should continue to serve for the term for which they were respectively elected.

Clearly, district judges and district attorneys are not county officers, and the association of county judges therewith in constitutional legislation is persuasive, though not controlling, that all were therein considered as belonging to the same class. Especially is this true when the sovereign was then exercising its legislative functions upon a different measure which it had denominated "concerning county officers," and grouped together therein, and in other contemporaneous

like legislation, the very officers it had in other portions of its organic law designated "county officers."

Furthermore, section 15 of article VI of the constitution empowers the general assembly to provide, after a designated date, that the election of the judges of the supreme, district and county courts, and the district attorneys, or any of them, shall be on a different day from that on which an election is held for any other purpose. Here again, county judges are included within the same class as judges of the supreme and district courts, and district attorneys. Moreover, the purpose of this constitutional provision is well understood. It was intended that whenever it was deemed advisable the general assembly could readily place the election of the judges of the courts, and the court officials designated, beyond the effect of partisan politics and thus remove them from its influence. If a county judge is a county officer the general assembly would not have such powers over the officials exercising such judicial functions within the city and county of Denver, as that power would then be vested in the makers of the charter. When we hold, as we do, that a county judge is not a county officer, within the meaning of the constitution, we harmonize its several parts, including the amendments thereto, so that article VI and article XX each have full force and effect in the city and county of Denver. Moreover, it gives effect to section 15 of article VI, all of article XIV, and eliminates the inconsistencies in the provisions of article XX which would otherwise exist. Defendant in error, however, contends that the controversy is *res judicata* by the decision of *People v. Cassidy*, 50 Colo. 503, wherein *Johnson v. People*, 34 Colo. 143, and *People v. Horan*, 34 Colo. 304, are criticised, and the reasoning of the dissenting opinions rendered therein adopted to support the views and conclusions reached in the *Cassidy* case.

It is true that in the *Johnson* case the office now under consideration was in controversy, one claimant basing his rights thereto upon an election under the state law, and the

other basing his upon an election under the provisions of the charter of the city and county of Denver. The decision there-in was not confined to the issues presented, nor was it determined therein that a county judge is a county officer, but as said in *People v. Cassidy, supra,* 506; "That case was determined upon the broad proposition that the people of the whole state could not amend their constitution so as to permit the people of the consolidated body known as the city and county of Denver, by their charter, to name agencies, other than those already provided by the constitution and general laws, to discharge, within that territory, governmental duties relating to state and county affairs." The *Johnson* case was one of eight cases pending before the court, involving the title to the following offices in the city and county of Denver, to-wit: county judge, county assessor, county clerk, and *ex-officio* recorder, treasurer, constable, sheriff, county commissioners, and justice of the peace. The cases were argued orally and submitted at the same time. The majority opinion states that they all involve, substantially, the same questions, except that the *Johnson* case involves the further question, whether the charter convention was authorized to increase the number of county judges to two. These officers are all mentioned therein as "county officers," but the additional question said to be presented in the *Johnson* case was not determined. On the contrary, it was held, and the case was determined upon the theory that the exercise by the people of the city and county Denver, in their charter, of the power expressly delegated to them by sec. 2 of article XX, to name the agencies who shall perform the acts and duties required of county officers, to be done, by the constitution, or by the general law, as far as applicable, would be subversive of a republican form of government, and, therefore, could not be so exercised. The majority opinion in the *Horan* case was based upon the same theory and unsound argument. The reasoning of the majority opinions in that and the *Johnson* case we have condemned. The *Cassidy* case declines to accept such theory and repudiates the

argument in support thereof and adopts the argument of the
dissenting opinions therein.  On page 533 in the *Cassidy* case
we said:  "The reasons urged for the conclusions in the *John-
son* case, which are made applicable in all of the county offi-
cers' cases, are plainly shown to be without merit.  The judg-
ments rendered upon that reasoning are wrong, with reference
to the enforcement of a fundamental law, permanently affect-
ing important governmental questions."  And further on page
535:  "We conclude, therefore, that the reasoning in the
*Johnson* case ought not to stand.  The judgment there en-
tered is the law of the case; it remains undisturbed and is
binding upon the parties thereto."

The *Cassidy* case involved the office of county commis-
sioners, and none other.  There was no issue therein as to the
office of county judge.  Should we concede that some expres-
sions in that opinion imply that the office of county judge is
of the same character as that of county commissioner and
should be governed by the same principles, it must be borne in
mind the office of county judge was not involved, and ex-
pressions in reference thereto are necessarily *obiter*.  Such ex-
pressions, if they exist therein, certainly should not bind this
court to the extent of causing it to disregard specific provi-
sions of the constitution, when a case in which they are in-
volved is under consideration.  For the purpose of supporting
the views of the court expressed in the *Cassidy* case, the rea-
soning of the dissenting opinion of Mr. Justice Steele in the
*Johnson* case, concurred in by Mr. Justice Gunter, and the dis-
senting opinion of the latter, concurred in by the former, in
the *Horan* case, was adopted and relied upon.  This measures
the extent to which we are bound thereby.  However, we re-
affirm our conclusion that those dissenting opinions are sound
and logical.  At the threshold of Mr. Justice Steele's dissent-
ing opinion he made it plain that he entertained doubts
whether article XX conferred upon the people of the city and
county of Denver the power to provide by charter for an addi-
tional county judge, therein expressly stating that it "depends

upon an interpretation of the article itself with a view to determining its true intent and purpose." He further pointed but that the majority opinion had not attempted to determine the true intent and purpose of article XX, "but it has found in the general propositions announced in the *Sours* case to the effect there must be, within every political sub-division of the state, some agency for performing the governmental duties of the state in accordance with the general laws of the state, satisfactory authority for declaring it to be *'stare decisis,'* not only that there cannot be two county judges within the city and county of Denver, but that the plan of joint city and county government, by a single set of officers, as provided for by the article, must be overthrown and held for naught, and a double set of officers—city officers and county officers—installed and maintained in the single body politic and corporate known as the city and county of Denver."

Having stated that it was a debatable question whether the charter could provide for an additional county judge within the city and county of Denver, and the question depended upon an interpretation of the article to determine its true intent and purpose, he expressly says that the people of the city and county of Denver in that respect "have just such authority as was conferred upon them by article XX—conferred expressly or by necessary implication—and none other." He declines to determine the true intent and purpose in that respect of article XX, and limits the discussion and his conclusion to the right of the people of the city and county of Denver to designate, in their charter, the officers who shall perform therein the duties of certain officers which he names and which do not include county judge. He therein, on page 164, said: "I shall, therefore, shorten the discussion by simply contending that there is nothing either in the *Sours* case, or in any other case, for that matter, to justify the conclusion of the court that the people of the city and county of Denver had no authority to legislate in any particular with respect to the offices of sheriff, treasurer, assessor, clerk and recorder, jus-

tice of the peace or constable, or dispense with county com-
missioners." The officers here named by Mr. Justice Steele
are the identical officers, with the exception of county super-
intendent of schools, which are named and designated "county
officers" in article XIV of the constitution. Moreover, they
are the identical officers named in article XX, in providing for
a temporary or provisional government for the city and county
of Denver, and whose terms of office are made to expire upon
the adoption of a charter. So as to this matter the effect of
Mr. Justice Steele's dissenting opinion is, that if the office of
county judge is, in truth, a county office, upon which he ex-
presses no opinion, it comes clearly within the meaning of
article XX.

As to the reasoning of Mr. Justice Gunter in the dissent-
ing opinion in the *Horan* case, it also strengthens and sup-
ports the views herein expressed, and the conclusions reached.
He therein calls attention that the bill for submitting article
XX was introduced by Senator Rush; that the bill for sub-
mitting amendments to article XIV by Senator Taylor. He
then says: "The bill of Senator Taylor might pass the legis-
lature and be adopted by the people as an amendment to the
constitution; the bill of Senator Rush might fail of passage
or adoption. The bill of Senator Taylor was so framed that
in such contingency it might apply to the county of Arapahoe,
but that it might not by possibility conflict with article XX in
the event of article XX becoming a law, it was expressly pro-
vided at the close of each of the sections proposed as amend-
ments to article XIV as follows: 'This section shall govern
except as hereafter otherwise expressly directed or permitted
by constitutional amendment.'" He then refers to sec. 8 of
article XX hereinbefore quoted, and declares that thereby the
purpose is made manifest to have article XX control, as
against any existing provisions of the constitution, or any pro-
posed amendments to the constitution, as those proposed to
article XIV. If this was the purpose and intent it is con-
clusive that in failing to make such exception, or one of sim-

ilar import, to secs. 21 and 22 of article VI, also as hereinbe-
fore stated introduced by Senator Taylor, it was intended that
there be no exceptions to the operation of such sections.

We are in no wise embarrassed by anything said *In Re
Compensation of County Judges,* 18 Colo. 272. The question
of the duties and jurisdiction of county judges was not there
considered. Moreover, it was an opinion handed down in an
*ex parte* hearing upon an inquiry from the legislature. Be-
sides, the constitutional provision as to compensation of offi-
cers, which was the basis of the inquiry therein, has been
amended, so the opinion no longer has any force for any pur-
pose.

Our attention has been called to certain laws enacted by
the general assembly, wherein it is claimed that county judges
have been treated as county officers. It is sufficient in answer
to say that if such be true, it cannot affect this case. For the
simple reason that wheresoever the constitution and the enact-
ments of the general assembly disagree, the constitution gov-
erns, and that instrument has not included county judge in
the classification of county officers, but expressly placed it
elsewhere.

Having determined that a county judge is not a county
officer within the meaning of the constitution, it necessarily
follows that the judgment must be reversed, and it is so
ordered with directions to dismiss the petition and discharge
the writ.          *Judgment Reversed.*

Decision *en banc.*

Mr. JUSTICE HILL and Mr. JUSTICE BAILEY fully con-
cur; Mr. JUSTICE GARRIGUES concurs in the result; CHIEF
JUSTICE CAMPBELL dissents; Mr. JUSTICE MUSSER and Mr.
JUSTICE GABBERT not participating.

Dissenting opinion by CHIEF JUSTICE CAMPBELL:

To be of any practical benefit to the parties concerned at
the general election, only a few days off, the decision of this

cause should be announced as soon as the majority opinion is prepared. There is, therefore, no time for the preparation of a dissenting opinion. That the ground upon which the dissent is based may be known, I merely say that the reasoning in the *Cassiday* case, from which I dissented when it ' was handed down, requires an affirmance of the judgment. If this were a case of first impression in this court, I would unhesitatingly concur in the majority opinion written by Mr. Justice White, whose reasoning to my mind is so conclusive, though it be opposed to that of the *Cassiday* case, that I would not be so rash as to attempt to answer it. But we should now follow and enforce the decision in the *Cassiday* case, being, as it is, the latest expression of the views of the majority of this court, in which is repudiated the reasoning of the *Johnson* case, a case involving the status of the very office now under consideration. Hereafter, of course, this, the majority decision herein, which is now the latest expression of this court, must control, and it may be said with entire propriety, that in my judgment it. is the true doctrine, the one for which I have hitherto always contended.